IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 27, 2017

## MARQUIS D. HENDRICKS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
No. 105618   Steven Wayne Sword, Judge

_____

### No. E2016-02123-CCA-R3-PC

_____

The Petitioner, Marquis D. Hendricks, was convicted of first degree murder, attempted first degree murder, possession of cocaine with intent to deliver, possession of cocaine with intent to sell, and simple possession of marijuana. The Petitioner received an effective sentence of life in prison for the convictions. The Petitioner filed a petition for post-conviction relief arguing that he received ineffective assistance of counsel because trial counsel failed to argue and request jury instructions on the statutory defenses of duress and necessity. Following a hearing, the post-conviction court found that there was no deficient performance by trial counsel because the facts did not support either statutory defense and denied the petition. After a thorough review of the record, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Marquis D. Hendricks.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Charme Allen, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural History

A Knox County jury found the Petitioner guilty of first degree murder, attempted first degree murder, possession of cocaine with intent to deliver, possession of cocaine

with intent to sell, and simple possession of marijuana, and the trial court imposed a sentence of life imprisonment in the Tennessee Department of Correction. *See State v. Marquis Dashawn Hendricks*, E2013-00346-CCA-R3-CD, 2014 WL 1330184, at *3 (Tenn. Crim. App. Apr. 3, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014). On direct appeal, this court summarized the facts, as follows:

> The facts giving rise to [the Petitioner]'s indictment and ultimate convictions arose from events that took place in Knoxville between November 12 and 13, 2012.

> Nathaniel Bolding and Keith Hammock, brothers-in-law, lived in Lake City at the time of the incidents. Mr. Bolding, his wife, and two children shared a home in Lake City with his mother-in-law, Mr. Hammock, and Mr. Hammock's daughter. Mr. Hammock and Mr. Bolding were also good friends with a penchant for partying, drinking, and drug use. Mr. Bolding first established a relationship with [the Petitioner] when he lived at the Lonsdale housing project in Knoxville before moving to Lake City. In order to purchase crack cocaine from [the Petitioner], Mr. Bolding renewed his relationship with [the Petitioner] several weeks prior to the incidents that took place in November of 2012.

> At some point between the evening of November 12 and the morning of November 13, 2012, Mr. Hammock and Mr. Bolding went from Lake City to Knoxville several times to purchase drugs from [the Petitioner]. During one of the transactions, both Mr. Hammock and Mr. Bolding were shot as they were driving away from the purchase place. Mr. Hammock died as a result of his wounds. Mr. Bolding was shot in the right arm.

> As a result of a police investigation, [the Petitioner] was indicted by the Knox County Grand Jury in February of 2013 for first degree murder, attempted first degree murder, delivery of less than .5 grams of cocaine while employing a deadly weapon, possession of more than .5 grams of cocaine with intent to sell, and possession of more than one-half ounce but not more than ten pounds of marijuana with intent to sell. The case proceeded to trial.

> At trial, Nathaniel Bolding testified. At the time of trial, he was twenty-nine years old and lived and worked at a rehabilitation center in Jacksonville, Florida. Mr. Bolding recalled his relationship with his deceased brother-in-law, Mr. Hammock. He explained that the two men

were good friends but that they were not good influences on each other because they partied, drank, and used drugs together.

About two weeks prior to Mr. Hammock's death, Mr. Bolding took Mr. Hammock to [the Petitioner]'s apartment to buy crack cocaine.

Mr. Bolding recalled that the day prior to Mr. Hammock's death, Mr. Hammock traded [the Petitioner] a television worth $2,000 for $100 worth of crack cocaine. According to Mr. Bolding, [the Petitioner] only gave them fifty dollars['] worth of crack cocaine. Mr. Bolding and Mr. Hammock smoked the crack cocaine.

On the day of Mr. Hammock's death, Mr. Hammock pawned a pressure washer for cash. The men bought a bottle of tequila with the money. Subsequently, the men went to [the Petitioner]'s apartment where Mr. Hammock gave [the Petitioner] $100 so that he could get his television back from [the Petitioner]. [The Petitioner] informed Mr. Hammock that the television was at Chris Page's house. When Mr. Bolding and Mr. Hammock went to Mr. Page's house, they did not find the television.

At some point that same day, Mr. Hammock and Mr. Bolding bought $80 of crack cocaine from [the Petitioner]. The men returned to Lake City where they sat around a fire and smoked crack cocaine and marijuana. The marijuana was purchased from Chris Page earlier that same day. The men eventually ran out of crack cocaine so they decided to drive to Knoxville to purchase more crack cocaine. Mr. Hammock called [the Petitioner]. The men went back to Knoxville around 10:30 p.m. They bought another $80 worth of crack cocaine and smoked it on the way back to Lake City.

Desperate for more drugs, the men decided to return to Knoxville once more to purchase crack cocaine from [the Petitioner]. According to Mr. Bolding, the men had approximately thirty dollars between the two of them. They arrived on Texas Avenue at around 1:30 a.m. [The Petitioner] sold them more crack cocaine. The men returned to Lake City where they smoked the crack cocaine and drank the rest of the tequila. While they were drinking and using drugs, Mr. Hammock became agitated as he thought about the television that he lost to [the Petitioner]. The more upset Mr. Hammock became, the more he wanted to return to Knoxville.

At some point during the night or early morning, Mr. Bolding stated that the two men left Lake City again to go to the meth[a]done clinic in Knoxville. When they left town, Mr. Bolding drove the car because Mr. Hammock was too intoxicated to drive. The men decided that they would purchase more crack cocaine from [the Petitioner] and if [the Petitioner] did not return the television to Mr. Hammock[,] they would drive off without paying for the drugs.

As the men approached [the Petitioner]'s apartment in their car, [the Petitioner] came out to meet the car. [The Petitioner] leaned over and handed the drugs to Mr. Hammock, in the passenger seat. When Mr. Hammock asked [the Petitioner] for his television, [the Petitioner] told him that he did not have the television. Mr. Hammock instructed Mr. Bolding to drive away. As they drove away, [the Petitioner] said, "don't do it bitch" before pulling a pistol from his waistband and firing it at the car.

According to Mr. Bolding, the car had traveled about ten to fifteen feet when he heard three shots. Mr. Hammock immediately slumped over in the seat and knocked the car into neutral. Mr. Bolding tried to put the car into drive when he realized that he had been shot in the right arm. He had to use his left arm to shift the car into drive. Mr. Bolding tried to drive the car to the interstate to get Mr. Hammock to the hospital. As he approached Merchants Road, Mr. Bolding got dizzy and pulled off the road. At this point, Mr. Hammock was unresponsive. Mr. Bolding left the car, ran to a gas station, and had someone call 911. Mr. Hammock was deceased by the time officers arrived on the scene. He suffered two wounds to the face that were not fatal and a gunshot wound to his back that hit a rib, entered his lung, and then hit the superior vena cava and aorta. Mr. Hammock died approximately one minute after being shot.

*Marquis Dashawn Hendricks*, 2014 WL 1330184, at *1-3.

## Post-Conviction Proceedings

The Petitioner timely filed a pro se "Petition for Post-Conviction Relief," claiming that he received ineffective assistance of counsel because he had "viable self-defense, duress and adequate provocation claim[s]," for which trial counsel failed to request jury instructions. The petition contained numerous other rambling, incoherent claims of ineffective assistance of counsel. After post-conviction counsel was appointed, counsel filed a "Notice," stating that counsel "has concluded that no basis exists to support any claims that trial counsel was

- 4 -

ineffective in this case. Counsel does not intend to file any Amended Petition in this case." Thereafter, the Petitioner filed a motion for dismissal of appointed counsel, which was granted by the post-conviction court, and current post-conviction counsel was appointed. An "Amended Petition for Post-Conviction Relief" was filed, claiming that trial counsel provided ineffective assistance by failing to request jury instructions on the statutory defenses of duress and necessity. The Amended Petition stated, "This petition includes all claims presently known to the Petitioner's counsel for granting post-conviction relief. The Petitioner's pro se petition includes additional grounds which, after a review of the record, the Petitioner's counsel does not find to be supportable by the available facts, evidence and law."

The Petitioner called trial counsel as his only witness at the evidentiary hearing on August 25, 2016. Trial counsel testified that he was appointed to represent the Petitioner and that he obtained approval to employ an investigator. Trial counsel testified that he had been practicing law since 1997 and that one hundred percent of his practice was devoted to criminal defense. He stated that he had represented thousands of criminal defendants and had been involved in hundreds of jury trials in state and federal court.

Trial counsel and the investigator met with the Petitioner numerous times. Trial counsel conducted a preliminary hearing and received discovery from the State. He developed a self-defense strategy based on the information he received from the Petitioner, which he summarized as follows:

> [The victims] went down and did a U-turn and came back to put the guy who got shot closest to [the Petitioner]. [The Petitioner] leaned in with the drugs. The guy snatched it out of his hand. At the same time, [the Petitioner] was wearing a hoodie, I think, believe the time was in the winter, pulled on it and pushed something against his chest or throat, in that area, and he believed it to be a weapon, and that the fellow had not only offered to sell a gun before but had offered to sell him a gun, if I'm not mistaken, earlier that day, and that's when he was afraid that he was going to be shot and robbed, and that he pulled out his weapon, was stepping backwards and hit his heels against the curb, and that's when he fired, and they pulled off.

Trial counsel stated that he never considered a defense of duress or necessity because he did not believe "that those [defenses] fit the facts," and he did not recall discussing the defenses of necessity or duress with the Petitioner. Trial counsel testified that he discussed self-defense with the Petitioner "[a]t length" and that, at his request, the trial court instructed the jury on self-defense.

- 5 -

The State called no witnesses, and after argument of counsel, the post-conviction court took the matter under advisement.

On September 22, 2016, the post-conviction court issued written "Findings of Facts and Conclusions of Law." The court found that trial counsel was "experienced and skilled" and "spent considerable time preparing for trial and developing a trial strategy . . . that was based primarily on statements of the [P]etitioner that he was retreating and falling down when he shot at the victim." The court further found that trial counsel did not make a request for an instruction on either necessity or duress "because [trial counsel] believed the facts did not support these instructions," and his strategy was self-defense. The post-conviction court found that "the facts as contained in the full record of the trial support [trial counsel's] assertion" and that trial counsel's performance was not deficient.

**Analysis**

The Petitioner asserts that he was denied the effective assistance of counsel because trial counsel failed to argue and request jury instructions for duress and necessity. The State argues that the post-conviction court properly dismissed the petition. We agree with the State.

*Standard of Review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id*.; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. *See* U.S. Const. amend. VI; Tenn.

Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

*General Defenses*

The defenses of duress and necessity were formerly available at common law. "With the enactment of the 1989 Criminal Code, all common law defenses were abolished, and replaced by statutory defenses." *State v. Culp*, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994), *see* Tenn. Code. Ann. § 39-11-203(e)(2).

Duress and necessity are not affirmative defenses that must be proven by a defendant. *Culp*, 900 S.W.2d at 710. Both defenses provide a general defense which must only be fairly raised by the proof before being considered by the trier of fact and any reasonable doubt on the issue requires an acquittal. Tenn. Code Ann. § 39-11-203(c), (d). "It is well-established in Tennessee that the trial court has the duty of giving a correct and complete charge of the law applicable to the facts of the case and that the defendant has the right to have every issue of fact raised by the evidence and material to the defense submitted to the jury upon proper instructions by the trial court." *State v. Green*, 995 S.W.2d 591, 604-05 (Tenn. Crim. App. 1998) (citing *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *cert. denied*, 498 U.S. 1007 (1990); *State v. Bryant*, 654 S.W.2d 389, 390 (Tenn. 1983); and *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975)).

Although the two defenses "are similar both in form and in the policy supporting the availability of both defenses[,]" they serve different purposes. *Id.* at 606. Concerning the differences in the two defenses, the United States Supreme Court stated:

> Common law historically distinguished between the defenses of duress and necessity. Duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law. While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. Thus, where A destroyed a dike because B threatened to kill him if he did not, A would argue that he acted under duress, whereas if A destroyed the dike in order to protect more valuable property from flooding, A could claim a defense of necessity.

*United States v. Bailey*, 444 U.S. 394, 409-10 (1980) (citing Wayne LaFave & Austin Scott, HANDBOOK ON CRIMINAL LAW 374-384 (1st ed. 1972)).

*Duress*

Duress is one of the general defenses codified in Part 5 of Chapter 11, Title 39 of the Tennessee Code Annotated; specifically, section 39-11-504 provides:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of

such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, *the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented* by the law proscribing the conduct, according to ordinary standards of reasonableness.

> (b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

Tenn. Code Ann. § 39-11-504 (emphasis added). The Comments of the Tennessee Sentencing Commission concerning section 39-11-504 state in part:

> Consistent with existing Tennessee law and a long history of Anglo-American tradition, this section recognizes the defense of duress. This rare defense is present when a defendant commits an offense because another person threatens death or serious injury if the offense is not committed.

Tenn. Code Ann. § 39-11-504, Sentencing Commission Comments. Even at common law, the defense of duress "ha[d] no application in the case of homicide." *Mallicoat v. State*, 539 S.W.2d 54, 57 (Tenn. Crim. App. 1976) (quoting 22 C.J.S. *Criminal Law* § 44); *see also State v. Robinson*, 622 S.W.2d 62, 73 (Tenn. Crim. App. 1980) (". . . the trial judge would have been justified in instructing the jury that coercion or duress is not a defense to the crime of homicide[]").

When the common law defense of duress was codified, the legislature included a balancing test in section 39-11-504(a). *See* Tenn. Code Ann. § 39-11-504(a). By requiring that the "desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented," the legislature preserved the exclusion of the defense of duress in the case of homicide. *See id.* "The theory underlying this defense is that it is better that the defendant commit the lesser harm than to lose his life." David Louis Raybin, 11 TENNESSEE PRACTICE, CRIMINAL PRACTICE & PROCEDURE § 28:54 (2016). Committing a homicide would not be a lesser harm than losing one's life, so the defense of duress would not be available under the balancing test of section 39-11-504(a) in the case of homicide.

According to trial counsel, the Petitioner claimed that "he was afraid that he was going to be shot and robbed[]" because one of the victims had offered to sell the Petitioner a gun earlier that day. After handing the drugs to the victims, the Petitioner

then stepped backwards, pulled out his gun, and shot towards the victims. The post-conviction court correctly determined that facts did not support a jury instruction on the defense of duress. The defense of duress would clearly have been inapplicable to the Petitioner's charge of first degree murder because, as explained above, the urgency of harm to the Petitioner would not have outweighed the harm to the deceased victim. Additionally, trial counsel was not deficient for failing to request a jury instruction on duress for the Petitioner's remaining charges; trial counsel's strategy was to argue that he acted in self-defense and this was a sound trial strategy based on the evidence presented at trial. We will not second-guess a reasonable but ineffective trial strategy. *Granderson*, 197 S.W.3d at 790. The Petitioner has failed to prove that trial counsel's failure to request a jury instruction on duress was "below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688).

*Necessity*

The common law defense of necessity, like self-defense, is grouped with the defenses that provide a justification excluding criminal responsibility and are codified in Part 6 of Chapter 11, Title 39 of our Code. Tennessee Code Annotated section 39-11-609 provides:

> Except as provided in §§ 39-11-611--39-11-616, 39-11-620 and 39-11-621,[1] conduct is justified, if:
>
> (1) The person reasonably believes the conduct is immediately necessary to avoid imminent harm; and
>
> (2) The *desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented* by the law proscribing the conduct, according to ordinary standards of reasonableness.

Tenn. Code Ann. § 39-11-609 (emphasis added). The Comments of the Tennessee Sentencing Commission concerning section 39-11-609 state, in part:

> This section codifies the common law defense of necessity. It excuses criminal liability in those exceedingly rare situations where criminal activity is an objectively reasonable response to an extreme situation. For example, the necessity defense would bar a trespass

---

[1] None of the exceptions are applicable to the issues in this appeal.

conviction for a hiker, stranded in a snowstorm, who spends the night in a vacant cabin rather than risking death sleeping in the open.

The defense is limited to situations: (1) where the defendant acts upon a reasonable belief that the action is necessary to avoid harm; and (2) *where the harm sought to be avoided is clearly greater than the harm caused by the criminal act.* The defense is further limited in application to those offenses where it is not expressly excluded by statute.

Tenn. Code Ann. § 39-11-609, Sentencing Commission Comments (emphasis added).

"Necessity has traditionally been used appropriately when the extreme situation is brought on by something other than a human act." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing Neil P. Cohen, et al., *Prevalence and Use of Criminal Defenses; A Preliminary Study*, 60 Tenn. L. Rev. 957, 966 (1993)). Under common law, the defense of necessity had application in the case of homicide; for example:

[W]here two persons being shipwrecked, have got on the same plank, but finding it not able to save them both, one thrusts the other from it, and he is drowned, this homicide is excusable, through unavoidable necessity, and upon the great universal principle of self-preservation, which prompts every man to save his own life, in preference to that of another, when one of them must inevitably perish.

*See Smith v. Brazelton*, 48 Tenn. 44, 51 (1870) (internal citation omitted)

When the common law defense of necessity was codified, the legislature included in section 39-11-609(2) the identical balancing test that it included in section 39-11-504(a). *See* Tenn. Code Ann. § 39-11-609(2). The defense of necessity is predicated on the theory that it is better to allow a crime to go unpunished where the crime was committed to avoid a greater and more serious harm[.]" David Louis Raybin, 11 TENNESSEE PRACTICE, CRIMINAL PRACTICE & PROCEDURE § 28:59 (2016). This theory is echoed language in the Sentencing Commission Comments cited above: "The defense is limited to situations[] . . . where the harm sought to be avoided is clearly greater than the harm caused by the criminal act." Tenn. Code Ann. § 39-11-609(2), Sentencing Commission Comments. Assuming that death is the maximum harm that an individual can suffer, the harm resulting from a homicide can never be less that the harm sought to be avoided by a defendant. *See* Tenn. Code Ann. § 39-11-609(2).

Thus, the statutory defense of necessity arguably has no application in the case of homicide, and therefore, trial counsel was not deficient in failing to request a jury instruction for necessity. However, it is not necessary for this court to go that far in determining that the Petitioner's claim must fail. First, the "extreme situation" the Petitioner claimed he faced was *not* "brought on by something other than a human act." *Davenport*, 973 S.W.2d at 287. Instead, the Petitioner created the allegedly harmful situation by selling illegal drugs and because he feared harm from the victims. Second, based on the information provided by the Petitioner and based on the investigation conducted by trial counsel and his investigator, counsel decided on a trial strategy claiming the Petitioner acted in self-defense. Trial counsel discussed self-defense with the Petitioner "[a]t length." The trial court instructed the jury on self-defense. Trial counsel's strategy was reasonable and sound, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson*, 197 S.W.3d at 790. The Petitioner has failed to prove that counsel's failure to request a jury instruction on necessity was "below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688).

**Conclusion**

Accordingly, the Petitioner is not entitled to relief in this appeal. The post-conviction court's judgment dismissing the petition for post-conviction relief is affirmed.

_____

ROBERT L. HOLLOWAY, JR., JUDGE